UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMMIE JUNIOR CLARK,

    Petitioner,　　　　　　　　　　　　Hon. Paul L. Maloney

v.　　　　　　　　　　　　　　　　　　Case No. 1:06-CV-217

THOMAS BELL,

    Respondent.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Clark's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Clark's petition be **denied**.

## BACKGROUND

As a result of an incident which occurred on or about August 23, 2002, Petitioner was charged with two counts of larceny. (Trial Transcript, June 26, 2003, 17). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Thomas Ellery**

As of August 23, 2002, Ellery was employed as a field supervisor for Midwest Steel Inc. (Trial Transcript, June 30, 2003, 19-20). As of that date, Midwest Steel was located at the Rouge Steel facility in Dearborn. (Tr. 19). On the morning of August 23, 2002, Ellery arrived at work at approximately 6:00 a.m. (Tr. 20, 27). Upon his arrival, Ellery discovered "that the cable that secured all of the equipment was cut and one of the welders was missing." (Tr. 20-22). Ellery described the missing welding machine as a "Miller Bobcat 225," also known as "a propane welder on wheels." (Tr. 22). Ellery identified the welding machine's identification and serial number as 6885 and LA 262132, respectively. (Tr. 22, 25). Ellery testified that this particular welding machine had been present the previous day and that nobody had permission to use (or remove) it before his arrival the following morning. (Tr. 25-26).

On August 27, 2002, Ellery was directed by an investigator to a location in Detroit "to identify a welding machine." (Tr. 27-28). When Ellery examined the welding machine in question, he observed that "it had Midwest stickers on it and the identification number on it." (Tr. 28). The welding machine was located in the bed of a white pick-up truck. (Tr. 29). As of August 23, 2002, the fair market value of this welding machine was $2,405. (Tr. 31-32).

**Ronald Hill**

As of August 23, 2002, Hill was employed as a truck driver for Eaglebrook Transport. (Trial Transcript, June 30, 2003, 56-57). At approximately 4:30 a.m. on August 23, 2002, Hill arrived at the Rouge Steel facility to make a chemical delivery. (Tr. 57). As Hill started to unload the chemicals he heard a "bang" immediately after which he observed a forklift "flying by [him] at

2

a pretty high rate of speed." (Tr. 58).

After unloading the chemicals and taking care of his paperwork, Hill reentered his truck. (Tr. 58-59). At this point, Hill observed "someone wondering around. . .amongst the tool boxes. . .where Midwest Steel kept their equipment." (Tr. 59). Hill identified this man as Petitioner. (Tr. 60-61). Petitioner was wearing green coveralls, a do-rag, and a baseball cap. (Tr. 62). Hill also noticed that Petitioner was wearing white tennis shoes, which struck him as odd because "in a steel mill you don't wear white tennis shoes." (Tr. 62) Hill testified that Petitioner was "toying with the locks to see if they were locked." (Tr. 59-60). Hill knew that Midwest Steel "did not have a midnight shift," so he began watching Petitioner. (Tr. 61). Petitioner eventually walked to where the portable welding machines were locked together and began "pulling on the cables that were attached to the welders." (Tr. 61). Petitioner then got back on the forklift and drove to a different location. (Tr. 61-62). Hill informed a security guard as to what he had observed and then departed the Rouge Steel facility. (Tr. 62-63).

**Steven Frankiewicz**

As of August 23, 2002, Frankiewicz was employed at the Rouge Steel facility. (Trial Transcript, June 30, 2003, 89-90). At approximately 4:30 a.m. that morning Frankiewicz heard a "loud noise that was coming from behind the [steel] pick up lines." (Tr. 90). Frankiewicz investigated the noise and observed a man driving a hi-lo at a high rate of speed "from one end of the plant to the other." (Tr. 90-91). The man had loaded pieces of brass on the hi-lo, but because he was traveling at such a high rate of speed, several of the brass pieces had fallen off. (Tr. 91). Frankiewicz identified Petitioner as the man who was driving the hi-lo. (Tr. 92-93).

Frankiewicz then "turned and went and got the foreman." (Tr. 93). Frankiewicz returned to the area with the foreman, Henry Reed, and another man, Joe Olasco. (Tr. 93). The hi-lo was unoccupied, but Frankiewicz observed that its "ignition was broke and turned on." (Tr. 93-94). Frankiewicz also observed a dark red pick-up truck nearby. (Tr. 94). Frankiewicz saw a "piece of equipment" in the back of this pick-up truck. (Tr. 95). Frankiewicz identified this equipment as the stolen Midwest Steel welding machine. (Tr. 28-30, 95-96).

**Willie Pittman, Jr.**

At approximately 12:30 p.m. on August 23, 2002, Petitioner arrived at Pittman's tire shop. (Trial Transcript, June 30, 2003, 116-17). Pittman knew Petitioner "from the streets." (Tr. 117). Petitioner told Pittman that he had a welding machine that he wanted to sell to him. (Tr. 118). Petitioner told Pittman that he "got the welder from cleaning out a building." (Tr. 118). According to Petitioner, "somebody paid him to clean out a building and [the welding machine] was in the building." (Tr. 118). Pittman identified the welding machine that Petitioner offered for sale as the welding machine that was stolen from Midwest Steel earlier that day. (Tr. 28-30, 119).

**Mel Baggett**

Baggett testified that he had been employed by Rouge Steel since 1976, most recently as Director of Employee Relations and Union Affairs. (Trial Transcript, June 30, 2003, 134). Baggett testified that Petitioner had been employed by Rouge Steel "several years ago." (Tr. 135). However, Petitioner was not an employee of Rouge Steel as of August 23, 2002. (Tr. 135).

**Ray Gillis**

Gillis testified that he was a private investigator. (Trial Transcript, July 1, 2003, 13-14). As of August 2002, Gillis was employed by Rouge Steel to investigate worksite theft. (Tr. 14). As part of this investigation, Gillis was dispatched to a location near Pittman's and Associates Tire Company at approximately 11:30 a.m. on August 23, 2002. (Tr. 15-16). While conducting surveillance at this location, Gillis witnessed Petitioner driving a red pick-up truck in the bed of which was the welding machine which had been stolen from Midwest Steel earlier that day. (Tr. 16-28). Gillis observed Petitioner unload the welding machine at Pittman's, after which he drove away. (Tr. 16-21). Gillis followed Petitioner, who returned to his residence. (Tr. 21).

On August 26, 2002, Gillis was conducting surveillance of Petitioner's residence. (Tr. 22-23). Gillis observed that "the red pick up truck that [Petitioner] had been utilizing for the past few days was in the driveway." (Tr. 23). While conducting this surveillance, Gillis witnessed the police arrest Petitioner in the driveway of his residence. (Tr. 23-24). The police also seized the red pick-up truck. (Tr. 24). Gillis followed the police to the impound yard, where he was permitted to examine the bed of the pick-up. (Tr. 24-25). Gillis observed a pair of bolt cutters in the bed of the pick-up truck. (Tr. 24).

**Joseph Olesezkowkicz**

Olesezkowkicz testified that as of August 23, 2002, he was employed at the Rouge Steel facility. (Trial Transcript, July 1, 2003, 73). At approximately 4:30 a.m. on the morning of August 23, 2002, Olesezkowkicz observed a man driving a "hi-lo" at a high rate of speed through the facility. (Tr. 73-82). The man was wearing "green coveralls" and was using the hi-lo to place

brass plates into a red pickup truck. (Tr. 74-82). Olesezkowkicz identified Petitioner as the man who was driving the hi-lo that morning. (Tr. 84).

Following a jury trial, Petitioner was convicted of one count of larceny of property with a value of $1,000.00 or more but less than $20,000.00. (Trial Transcript, July 2, 2003, 18). Petitioner subsequently pleaded guilty to being an habitual offender, having previously been convicted of at least three felonies. (Dkt. #29). Petitioner was sentenced to serve 46 months to 25 years in prison. (Sentencing Transcript, October 24, 2003, 14). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claim:

> I. Mr. Clark's conviction for larceny of a welding machine is barred by double jeopardy and collateral estoppel, where the jury at a previous trial had already decided that he was mistakenly identified as the person who committed that act.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Clark*, No. 252545, Opinion (Mich. Ct. App., Sept. 13, 2005). Asserting the same claim, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Clark*, No. 129744, Order (Mich., Dec. 27, 2005). On March 29, 2006, Petitioner initiated the present action in which he asserts the following claims:

> I. The prosecutor added the transaction (theft) of the welder with the theft of the truck.
>
> II. My conviction was barred by double jeopardy and collateral estoppel.

6

**STANDARD OF REVIEW**

Clark's petition, filed March 29, 2006, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause

of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

8

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

In February 2003, Petitioner was tried for the crime of receiving and concealing stolen property with a value of $1,000.00 or more but less than $20,000.00, in violation of Mich. Comp. Laws § 750.535(3)(a). Specifically, it was alleged that Petitioner "did buy, receive, possess, conceal, or aid in the concealment of. . .stolen embezzled, or converted property," specifically a 1989 Ford F-150 pick-up truck, "knowing that the property was stolen, embezzled, or converted" and that "the value of the property was $1,000.00 or more but less than $20,000.00." (Dkt. #29, Felony Information). It was alleged that this crime occurred on August 26, 2002. *Id.* Petitioner was acquitted of this charge following a jury trial. Petitioner asserts that his subsequent conviction for larceny of a welding machine violates the double jeopardy protections of the Fifth Amendment to the United States Constitution.

In *Ashe v. Swenson*, 397 U.S. 436 (1970), the Court addressed whether the Double Jeopardy Clause of the Fifth Amendment, applicable to the states via the Fourteenth Amendment, protected criminal defendants from defending in a subsequent matter an issue on which they prevailed in a previous proceeding. In that case, Bob Ashe and several other men were charged with six counts of armed robbery. *Id.* at 437-38. Specifically, Ashe was charged with entering a home

and robbing each of the six men playing poker therein. *Id.* Ashe was subsequently tried on the charge of robbing Donald Knight, one of the participants in the poker game. *Id.* at 438. Knight and several of the other robbery victims testified. The evidence was "unassailable" that Knight and the other victims had property stolen during the armed robbery. However, the evidence that Ashe had participated in the robbery was "weak." *Id.*

The jury was instructed that if it found that Ashe "was one of the participants in the armed robbery, the theft of 'any money' from Knight would sustain a conviction." *Id.* at 439. The jury was further instructed that if Ashe "was one of the robbers, he was guilty under the law even if he had not personally robbed Knight." The jury found Ashe "not guilty due to insufficient evidence." Several weeks later Ashe was tried for the armed robbery of a man named Roberts, one of the other participants in the poker game. Ashe unsuccessfully moved to dismiss these charges on the ground that they were precluded by the acquittal of the charge of robbing Donald Knight. *Id.*

At this second trial, the individuals who had at the previous trial been unable to identify Ashe as one of the robbers presented "substantially stronger" testimony identifying Ashe as one of the participants in the robbery. *Id.* at 439-40. After being given "instructions virtually identical to those given at the first trial," Ashe was found guilty. *Id.* at 440. After unsuccessfully challenging his conviction in state court, Ashe pursued habeas relief in federal court. *Id.* Ashe's petition was denied by the district and appellate courts, after which the United States Supreme Court agreed to hear the matter. *Id.* at 440-41.

After noting that it had not previously addressed "whether collateral estoppel. . .is a due process requirement in a state criminal trial," the Court stated that "[t]he question is no longer whether collateral estoppel is a requirement of due process, but whether it is a part of the Fifth

Amendment's guarantee against double jeopardy." *Id.* at 442. The Court answered this question in the affirmative, observing that:

> Collateral estoppel is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgement, that issue cannot again be litigated between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v. Oppenheimer*. . . .As a rule of federal law, therefore, it is much too late to suggest that this principle is not fully applicable to a former judgment in a criminal case. . .The ultimate question to be determined. . .is whether this established rule of federal law is embodied in the Fifth Amendment guarantee against double jeopardy. We do not hesitate to hold that it is. For whatever else that constitutional guarantee may embrace, it surely protects a man who has been acquitted from having to 'run the gauntlet' a second time.

*Id.* at 443-45 (internal citations omitted).

The Court then determined that Ashe's conviction ran afoul of this constitutional protection:

> Straightforward application of the federal rule to the present case can lead to but one conclusion. For the record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that Knight had not been a victim of that robbery. The single rationally conceivable issue in dispute before the jury was whether [Ashe] had been one of the robbers. And the jury by its verdict found that he had not. The federal rule of law, therefore, would make a second prosecution for the robbery of Roberts wholly impermissible.

*Id.* at 445.

The Court cautioned that "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with

11

realism and rationality." *Id.* at 444. Accordingly, where "a previous judgment of acquittal was based upon a general verdict," a court faced with a claim that such an acquittal bars, on collateral estoppel grounds, a subsequent prosecution, the court must examine "the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* Petitioner bears the burden to demonstrate that "the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Schiro v. Farley*, 510 U.S. 222, 233 (1994) (quoting *Dowling v. United States*, 493 U.S. 342, 350 (1990)).

The recognition by the *Ashe* Court that the Fifth Amendment's protection against double jeopardy encompasses the concept of collateral estoppel does not, however, compel the government to join in a single prosecution every charge which could conceivably be brought. As the Supreme Court has recognized:

> The collateral-estoppel effect attributed to the Double Jeopardy Clause may bar a later prosecution for a separate offense where the Government has *lost* an earlier prosecution involving the same facts. But this does not establish that the Government 'must. . .bring its prosecutions. . .together.' It is entirely free to bring them separately and can win convictions in both.

*United States v. Dixon*, 509 U.S. 688, 705 (1993) (internal citations omitted).

Moreover, neither the Double Jeopardy Clause of the Fifth Amendment nor the Court's ruling in *Ashe* creates a barrier to the introduction against a criminal defendant of evidence regarding alleged criminal conduct for which he has been acquitted. *See Dowling*, 493 U.S. at 348 ("we decline to extend *Ashe v. Swenson* and the collateral-estoppel component of the Double Jeopardy Clause to exclude in all circumstances. . .relevant and probative evidence that is otherwise

admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted").

As part of his Rule 5 submissions, Respondent submitted a transcript of the testimony presented at Petitioner's February 2003 trial for receiving and concealing stolen property. (Dkt. #37). Respondent's submission did not, however, include the attorneys' opening or closing statements or the trial court's instructions to the jury. Respondent has since indicated that he has submitted to this Court all the Rule 5 material he was provided by the court that conducted Petitioner's February 2003 trial. (Dkt. #40). The Court has no reason to question Respondent's efforts or veracity on this matter. To the extent that Petitioner's claim in this Court relies upon portions of the February 2003 proceedings which Respondent was unable to obtain, the Court has simply accepted as accurate Petitioner's description thereof. Before analyzing Petitioner's claim further, a brief description of the testimony presented at Petitioner's February 2003 trial is appropriate.

Thomas Ellery testified that the truck in question was stolen between 6:00 p.m. on August 14, 2002, and 6:00 a.m. on August 15, 2002. (Trial Transcript, February 4, 2003, 4-12). Ellery testified that he was "told" that the market value of the stolen truck was "between five and six thousand dollars." (Tr. 15). On cross-examination, Ellery acknowledged that he did not "know anything" about the truck's value and was simply repeating what he had been told. (Tr. 18-19).

Joseph Oleszkowicz testified that as of August 23, 2002, he was employed at the Rouge Steel facility. (Trial Transcript, February 4, 2003, 21-22). At approximately 4:30 a.m. on the morning of August 23, 2002, Olesezkowkicz observed Petitioner driving a "hi-lo" in a "very erratic" manner through the facility. (Tr. 22-26). Petitioner was using the hi-lo to place brass plates into a

13

red pickup truck. (Tr. 25-26). Olesezkowkicz described this pickup truck as a "older" F-150. (Tr. 26). He also testified that the words "Midwest Steel" were located on the truck's doors, but that they "appeared to be spray painted over." (Tr. 27). Olesezkowkicz acknowledged that he never actually saw Petitioner in the pickup truck. (Tr. 28).

Steven Frankiewicz testified that as of August 23, 2002, he was employed at the Rouge Steel facility. (Trial Transcript, February 4, 2003, 32). At approximately 4:30 a.m. that morning Frankiewicz heard a "loud noise" coming from the area of the facility in which he worked. (Tr. 33). Frankiewicz investigated the noise and observed Petitioner driving a hi-lo at a "pretty fast" rate of speed through the facility. (Tr. 33-34). Frankiewicz and Olesezkowkicz walked to where the hi-lo had been abandoned and noticed that "the ignition was still on [but] there was no key in it." (Tr. 34-35). Frankiewicz then observed a red pickup truck nearby. (Tr. 35). Frankiewicz observed "some type of machinery in the back of the truck," as well as "metal of some kind or steel." (Tr. 35-36). He also testified that the words "Midwest Steel" were painted on the doors of the pickup truck, but that those words had been spray painted over. (Tr. 39). Frankiewicz was not asked to identify the "machinery" he observed in the back of the pickup truck.

Raymond Gillis testified that he was a private investigator who had been employed by the Rouge Steel Company to "investigate the theft of a pick-up truck," an "older model red Ford pick-up truck." (Trial Transcript, February 4, 2003, 42-43). Gillis testified that he located the truck on August 23, 2002, "parked just east of. . .Pittman Associates Tire Company." (Tr. 43-45). Gillis testified that the "emblem" on the doors of the pickup truck "had been painted over." (Tr. 46). Gillis observed Petitioner unload a "large piece of welding equipment" at Pittman's after which Petitioner drove the stolen pickup truck to his residence. (Tr. 46-50). On August 27, 2002, Gillis

14

returned to Pittman's to recover the welding machine that Petitioner had unloaded four days earlier. (Tr. 52-54). While Gillis testified about recovering the welding machine, he did not refer to the welding machine as having been stolen.

Ronald Powell testified that as of September 2002, he was employed as a Sergeant with the Detroit Police Department. (Trial Transcript, February 4, 2003, 55-56). Powell testified that he examined the stolen vehicle on September 10, 2002, after it had been recovered and impounded. (Tr. 7, 56-59). Powell testified that some type of "sign" had been painted on the truck's doors, but that it had been "painted over." (Tr. 59). Powell also testified that the ignition system had been "defeated." (Tr. 59-60).

Kenneth Wright testified that as of August 26, 2002, he was employed as a police officer with the City of Detroit. (Trial Transcript, February 4, 2003, 63). Wright testified that he participated in the arrest of Petitioner on August 26, 2002. (Tr. 63-70).

Andre Kirkland testified that as of August 27, 2002, he was employed as an officer with the Detroit Police Department. (Trial Transcript, February 4, 2003, 71). Kirkland questioned Petitioner on August 27, 2002. (Tr. 71-74). When asked how he came to be in possession of the stolen truck, Petitioner stated, "a guy I know named Larry needed some money so he let me use the truck for $25.00." (Tr. 75). Petitioner asserted that he did not know the truck was stolen. (Tr. 75).

In his closing argument, Petitioner asserted three separate theories in support of acquittal: (1) mistaken identity; (2) reasonable doubt as to the value of the truck; and (3) reasonable doubt that he knew the truck was stolen when he was arrested driving the truck on August 26, 2002. (Dkt. #1, Appellate Brief attached thereto at 3-4). With respect to the mistaken identity defense, Petitioner asserted that (1) Olesezkowkicz and Frankiewicz had mistakenly identified him as the man

15

who was driving a hi-lo truck at the Rouge facility at approximately 4:30 a.m. on August 23, 2002; and (2) Gillis mistakenly identified him as the man who unloaded from the back of the stolen truck a welding machine at Pittman's on August 23, 2002. *Id.* at 4. Petitioner asserts that his acquittal of receiving and concealing stolen property at his February 2003 trial precludes his subsequent conviction for stealing the welding machine. The Court disagrees.

A review of the testimony presented at Petitioner's trial for receiving and concealing stolen property reveals that the issue of the theft of the welding machine was not presented to the jury. While several witnesses at this first trial mentioned seeing a welding machine in the back of the stolen truck, evidence was not presented that the welding machine had been stolen or that Petitioner was the person who stole it. The first trial clearly concerned only the theft of the pickup truck and Petitioner's subsequent possession thereof.

As noted previously, Petitioner asserted three defenses at his trial for receiving and concealing the stolen truck: (1) mistaken identity; (2) reasonable doubt as to the value of the truck; and (3) reasonable doubt that he knew the truck was stolen. While a finding by the jury in favor Petitioner on the mistaken identity issue could perhaps have precluded Petitioner's subsequent conviction for larceny of the welding machine, Petitioner has not established, either through direct evidence or inference from the evidence of record, that this was the basis on which the first jury entered a verdict of acquittal. The jury could just as easily acquitted Petitioner because the prosecutor failed to present any credible evidence that the truck possessed a value of $1,000.00 or more but less than $20,000.00, or because they believed Petitioner's assertion to Officer Kirkland that he did not know that the truck was stolen. Neither conclusion would have precluded a subsequent finding that Petitioner stole the welding machine from the Rouge facility on August 23,

2002.

As indicated above, when "a previous judgment of acquittal was based upon a general verdict," a court faced with a claim that such an acquittal bars, on collateral estoppel grounds, a subsequent prosecution, the court must examine "the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." As explained immediately above, the jury in Petitioner's first trial could certainly have based its verdict on an issue other than that which Petitioner now asserts was foreclosed from consideration. Thus, Petitioner has failed to establish that "the issue whose relitigation he seeks to foreclose," whether he stole the welding machine or was present at the Rouge facility in the early morning hours of August 23, 2002, was actually decided at his first trial.

The Michigan Court of Appeals affirmed Petitioner's conviction for larceny of the welding machine, concluding that

> Because the basis of defendant's acquittal in the first trial cannot be determined, and the instant case involves an issue not actually litigated and necessarily determined in the first trial, defendant's double jeopardy protections, based on principles of collateral estoppel, did not bar defendant's larceny prosecution.

*People v. Clark*, No. 252545, Opinion at 3 (Mich. Ct. App., Sept. 13, 2005).

In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

**CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Clark's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

    Respectfully submitted,

Date:  February 11, 2009                 /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge